UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| WAG ACQUISITION, L.L.C., <br><br> Plaintiff, <br><br> v. <br><br> BERONATA SERVICES LTD., <br><br> PROWEB PROGRESSIVE DEVELOPMENT LTD., and <br><br> BNC TECHNOLOGY AND ADVERTISING LTD., <br><br> (all d/b/a "bongacams.com," "Bonga Cams," and "BongaCams"), <br><br> Defendants. | No. 2:25-cv-00162 <br><br> **JURY TRIAL DEMANDED** |

**ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff WAG ACQUISITION, L.L.C., for its original complaint for patent infringement against Defendants, alleges as follows.

**PARTIES**

1. Plaintiff WAG Acquisition, L.L.C. ("Plaintiff or "WAG") is a New Jersey limited liability company with its principal place of business at 275 Route 10 East, Suite 220-313, Succasunna, New Jersey 07876.

2. On information and belief, Defendant Beronata Services Ltd., d/b/a bongacams.com ("Beronata") is a limited company organized under the laws of Cyprus, with offices at Thermistokli Dervi 6, 1066, Nicosia, Cyprus.

3. On information and belief, Defendant Proweb Progressive Development Ltd. ("Proweb") is a limited company organized under the laws of Cyprus, with offices at Vyzantiou, 32, Agios Dometios, 2370, Nicosia, Cyprus.

4. On information and belief, Defendant BNC Technology and Advertising Ltd. ("BNC") is a limited company organized under the laws of Cyprus, with offices at Digeni Akreta, 8, Office 202, 1045 Nicosia, Cyprus.

5. The said Defendants herein all do business as "bongacams.com," "BongaCams," or "Bonga Cams," and are collectively referred to herein as "Bongacams" or "Defendants." Defendants, acting in concert, operate internet adult content interactive "webcam" sites, including without limitation the bongacams.com website and related "affiliate" and "white label" sites (including without limitation smutcam.com).

6. Defendants' servers (including servers in the U.S.), receive live internet feeds of video from numerous webcam performers (including performers in the U.S.), and stream those performances from servers (including servers that they control in the U.S.) to numerous users (including users in the U.S.).

**JURISDICTION AND VENUE**

7. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*.

8. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(b) because Defendants are foreign corporations.

9. This Court has personal jurisdiction over Defendants under at least Rule 4(k)(2), Fed. R. Civ. P., in that Defendants are foreign entities not subject to jurisdiction in any state's courts of general jurisdiction but which have continuous and systematic business contacts with

the United States, such that exercising jurisdiction over Defendants is consistent with the United States Constitution and laws. Defendants' business contacts with the U.S. include a substantial audience of paying customers in the U.S., including in the State of Texas. Defendant Beronata applied for and on March 3, 2015 obtained a U.S. trademark registration, No. 4,697,095, for "BONGA CAMS," with a stylized logo in said registration that is substantially identical to the logo that appears on the web site bongacams.com. Defendant Beronata filed an affidavit of use in commerce for this mark on February 15, 2021, during the period relevant to patent infringement as alleged herein, for all goods and services covered by the registration, including "providing an adult-oriented website via the Internet featuring adult-oriented stories, photographs, non-downloadable videos." At various times together covering the period relevant to the patent infringement alleged herein, the bongacams.com web site has contained text specifically identifying at least one of Defendants Beronata, Proweb, and BNC as responsible for managing and operating the site. Defendants have widely engaged in such commerce, and as a portion of such activities, transacted business within this District and elsewhere in the State of Texas. Further, this Court has personal jurisdiction over Defendants based on their commission of one or more acts of infringement of the patents-in-suit in this District and elsewhere in the State of Texas.

**THE ASSERTED PATENTS**

10. WAG owns United States Patent Nos. 10,567,453 (the "'453 patent"), 8,364,839 (the "'839 patent"), and 8,185,611 (the "'611 patent"), referred to collectively herein as the "Asserted Patents," and which are respectively attached hereto as Exhibit A, Exhibit B, and Exhibit C and incorporated herein by reference.

11. The Asserted Patents were respectively duly and legally issued, and later expired, on the dates set forth below. The entire content of each of the Asserted Patents is incorporated herein by reference.

| U.S. Patent No. | Issued | Expired |
| --- | --- | --- |
| 10,567,453 | Feb. 18, 2020 | Sep. 4, 2022 |
| 8,364,839 | Jan. 29, 2013 | Mar. 28, 2021 |
| 8,185,611 | May 22, 2012 | Mar. 28, 2021 |

12. The subject matter claimed in the Asserted Patents was developed in the course of business of SURFERNETWORK.COM, INC. ("SurferNETWORK"), a legal predecessor entity of WAG, and all rights therein were assigned by Harold Price (the sole inventor) to said predecessor entity. Through a continuous chain of assignments from Mr. Price and through said predecessor entity, duly recorded in the United States Patent and Trademark Office, WAG is the record owner of the entire interest in the Asserted Patents and all rights to recover for infringement thereof and holds and has held all substantial rights therein at all times material hereto. WAG has the sole and exclusive standing to enforce the Asserted Patents, bring these causes of action, and recover for past infringement of the Asserted Patents.

13. The Asserted Patents were duly issued pursuant to Title 35 of the United States Code, and the '453 and '611 patents and the '839 patent, to the extent of the claims asserted herein, are valid and enforceable.

14. WAG has complied with the applicable marking provisions of 35 U.S.C. § 287(a) with respect to the Asserted Patents at all times relevant hereto.

15. The Asserted Patents share a common disclosure, which concerns technological solutions to the severe problems that WAG's predecessor, SurferNETWORK, recognized in

then-current efforts to provide streaming media over the internet. Prior to these inventions, internet streaming implementations suffered chronically from slow, stuttering startup and frequent interruptions. When a user first clicked to begin playback of streaming media, a significant period of "buffering" would begin, during which period the user would typically only see an hourglass. After clicking on a stream, the user would have to wait until the player accumulated sufficient content over its internet connection for the program to start, and the lengthy startup delay would often have to be repeated during playback, for rebuffering, if line conditions later caused an interruption. These effects resulted in user frustration, which kept internet streaming from being competitive with other forms of audio and/or video media, such as radio and TV. Numerous efforts were made by others to improve the situation by attempting to control (*e.g.*, meter) the rate of delivery of media from the server to match to inferred needs and capabilities of the player, to keep the player in sync with the server so as to reduce the need for rebuffering, but these efforts continued to suffer from significant delays for the player to build up an initial playback buffer and proved unable to respond adequately to unexpected changes in internet connection quality.

16. SurferNETWORK sought a solution that would jump start internet media playback to achieve the perception of "Instant On," and provide an internet user an experience akin to what ordinarily happened when turning on a transistor radio. The Asserted Patents reflect that solution, for the first time providing a user experience for streaming over the internet that was comparable to the immediacy and continuity that the user enjoyed with ordinary radio and television.

17. Rather than to try to "meter" or "clock-out" data from the server in order to establish a delivery rate approximating playback for streaming, WAG's solution rearranged the

previously practiced order of operations in the streaming media server, to *pre-buffer* the media on the server side of the connection (which could be done in advance on the server side without user-perceptible delay), and, when a predetermined level of prefill was present, to deliver the streaming media to the user computer by way of the server's internet transport mechanism, as fast as the transport mechanism would allow. Streaming media data elements sent in this manner would be sent at the maximum speed available, thereby improving utilization of available bandwidth. The result was a more rapid streaming startup, which at the same time also quickly filled a playback buffer on the user computer, which served to protect the remainder of the transmitted stream from mid-stream delays and interruptions. WAG's technique was highly effective and was rapidly adopted throughout the internet streaming business.

18. Implementations disclosed in the Asserted Patents provide further advantages, for example where a live program is simultaneously streamed to many users. Under prior art implementations it would have been customary in such a case for the server software to have provisioned a separate server-side buffer for each user, or simply to serve the latest available data element as it arrived. The Asserted Patents disclose and claim streaming a live program to a plurality of users from a single, common server-side buffer, even though at any given time the various users may be at different points in the stream. This technique provides significant advantages, such as avoiding having to provision a separate server-side buffer for each user, thus conserving the server's memory resources, among other benefits, and this multi-user implementation meshes with the pre-buffering approach described above, which is still practiced for each user in the plurality of users consuming the stream.

19. Defendants' internet delivery of streaming video from its media servers, including media servers in the United States, has deployed and used methods of operation, systems, and computer-recorded media that infringe each of the Asserted Patents.

### COUNT I: DIRECT INFRINGEMENT OF THE '453 PATENT

20. WAG repeats and realleges the allegations of paragraphs 1-19 above as if fully set forth at length herein.

21. Defendants have directly infringed the '453 patent in violation of 35 U.S.C. § 271(a) by practicing the claims thereof, without authorization and in the United States, during the term thereof (as alleged herein), by conduct as hereinafter more particularly alleged.

22. Defendants' webcam video distribution systems are specifically adapted for "**distributing via the Internet streaming media**." Any user of these systems may readily observe, using standard web browser functionality, that Defendants' media is "**encoded as a plurality of sequential frames adapted for playback at a predetermined playback rate and comprising a plurality of sequential data elements**," for example, streams of data organized as time-sequenced MPEG-4 transport stream (.ts) files, encoded for a specified frames-per-second normal playback rate.

23. The Bongacams home page shows an extended grid of large thumbnail images as a gallery of available performers (models). A user, clicking on one of Bongacams' model thumbnails, will thereby request to view that performer's live stream, through an interactive viewer that supports multiple users, chats between and among viewers and the performer(s), tipping with Bongacams-provided monetary tokens, etc. Defendants' server will receive the request ("**receiving via data communications at a server a request from a user computer for the streaming media**").

24. As is evident from Bongacams' online Model Guide (accessible at bongamodels.com), and otherwise evident in any case by end user inspection, Defendants maintain ongoing data feeds to their bank of servers from the individual webcams of a substantial plurality of live performers in real time (the data feeds corresponding to the grid of performers shown on the Bongacams home page). Defendants have used, among others, an open source system known as "obs" (Open Broadcaster Software) for this purpose. Defendants collect the performer feeds in intermediate servers, organizing them by performer stream, in buffers on Defendants' servers, where the stream data elements may also be transcoded and otherwise preprocessed to meet downstream distribution and user requirements (user bandwidth, screen size, etc.). Since the performer's data arrives at Defendants' intermediate servers in real time, this process constitutes "**filling a server buffer allocated in a memory of the server, from a media source, at a constant fill rate equal to the playback rate**."

25. Due to the ongoing live nature of a performer's data feed, the corresponding server buffer for the stream will generally already have been "**filled to a predetermined level**" at times after the performer first signs in, when users see that the performer's link is live and request to view the stream. The server will join a user clicking on that link, and "**begin delivery of the streaming media to the user computer**," as recited in claim 1 of the '453 patent.

26. Based on observations as addressed below, it appears that, rather than begin delivery from the *most recent* data element received by the server from the selected performer (incoming buffer head), Defendants' server will instead begin delivery from a location in the buffer (initial takeoff point) that is *older in time* than the incoming buffer head, the time difference of this offset (between the incoming buffer head and the initial takeoff point for the

user in question) thus corresponding to the duration of the media constituting a "**predetermined level**" of media, in the '453 claims.

27. The takeoff point is the address in the buffer that feeds into the server's outgoing transport mechanism for its internet connection to the user. The takeoff point is the point in memory from which the server hands off data to its transport mechanism. On streaming startup, the entire initial block of media data lying in the buffer between the incoming buffer head and the initial takeoff point is connected to and thus handed off to the transport mechanism, which transfers the initial block of data to the user system at high speed.

28. The transport mechanism (which may be TCP, QUIC, WebRTC, etc.), by its nature, when it accepts data, always sends it to the user system as fast as the connection to the user system will allow, which for at least sustained periods during this process will be "**in excess of the playback rate**."

29. The effect of resulting initial high-speed transfer of a starting block of media data is to establish a buffer on the *user side* of the connection, because much of that data will arrive at the user system in advance of when it is needed for playback, and thus will queue up at the client to establish a client-side playback buffer. This allows the player to start playback quickly, but also supports continued uninterrupted playback by providing a further user-side store of elements delivered to the user buffer ahead of the time the user system requires them for continued playback.

30. Similarly, *after* the initial transfer, which sends data faster than it is coming into the server, the takeoff point in the server buffer will catch up with the incoming buffer head, to exactly or approximately coincide with the buffer head, so that newly arriving elements will pass

directly through to the transport mechanism, again each to be delivered at a sending rate in excess of the playback rate.

31. Likewise, if the server's transport mechanism should go into a non-accepting state (as, for example, may occur due to downstream network congestion), the elements arriving from the performer's feed remain in the server buffer (as unsent) until the transport mechanism again goes into an accepting state, at which time as much of the unsent sequential elements that are then in the server buffer, as the transport mechanism will accept, are sent to the user at a sending rate in excess of the playback rate, thus meeting the remaining limitations of claim 1 of the '453 patent.

32. The foregoing assertions about how Defendants' systems work internally are supported by the results of packet capture during test user sessions with Defendants' systems. These observations show that Defendants' streaming delivery is based *in part* on the well-documented HLS (HTTP Live Streaming) protocol, accounting for the observed stream of .m3u8 (index) and .ts (index) files (each .ts file carrying an .mp4 payload), for any given streaming program. This has been observed by packet capture during test user sessions with Defendants' systems.

33. However, in a *departure from* HLS, timestamps on packet captures as well as the order of network interactions between the user and server machines show that Defendants are actively pushing .ts elements out ahead of playback, and use the HLS .m3u8 index files to acknowledge delivery, rather than for staging client requests to the server for the successive media data elements (as in conventional HLS). Since the stream only arrives at Defendants' servers in real time, the fact that it can nevertheless send out a number of data elements in a stream *ahead* of when required for playback can only be accounted for by having pre-

accumulated at least that number of elements in a server buffer prior to beginning to send the stream to the user, in accordance with the asserted claims.

34. WAG gained its understanding that Defendants' servers were pushing out .ts elements ahead of playback after the '453 patent expired. WAG believes, however, based on consistency with its earlier observations of the same sites (while all of the asserted patents were in term), that its post-expiration observations reflect Defendants' continued manner of operation substantially as conducted prior to such expiration.

35. All limitations of at least claim 1 of the '453 patent were thus met by Defendants' conduct as alleged herein, during the term of the '453 patent, literally or under the doctrine of equivalents.

36. As another example, Defendants also transmit performer streams concurrently to multiple viewers in a manner that directly infringes at least claim 8 of the '453 patent. Observation of Bongacams streams reflects that the live video feeds of at least Defendants' top performers are generally each being viewed by a plurality of concurrent viewers, and there is no observable delay to build a server-side buffer in advance for each new viewer, reflecting that each user draws from an existing, common server-side buffer, such that Defendants are serving concurrent users out of a single buffer for the stream, tracking their positions in the stream, thereby "**maintaining a record of the last streaming media data element that had been sent from the server buffer to the user system, and using the record to identify the next streaming media data element in the server buffer to be sent to the user system**," as recited in at least claim 8 of the '453 patent.

37. Defendants monetize their streaming services in a number of ways, including direct user payments, advertising, and commissions, the success of which is driven in substantial

part by the responsiveness and reliability of Defendants' streaming, as made possible by the patented technology herein. The value of the patented technology is reflected in a number of ways, including without limitation the numerous licenses that other internet streaming providers such as the present Defendants have taken to WAG's patented streaming technology.

38. Pursuant to 35 U.S.C. § 284, WAG is entitled to not less than a reasonable royalty for Defendants' infringing use of the '453 patent, in an amount subject to proof at trial, together with interest and costs as fixed by the Court.

39. WAG is entitled to recover all past damages so sustained by WAG as a result of Defendants' infringement alleged herein.

**COUNT II: DIRECT INFRINGEMENT OF CLAIM 7 OF THE '839 PATENT**

40. WAG repeats and realleges the allegations of paragraphs 1-399 above as if fully set forth at length herein.

41. Defendants' conduct as set forth in Count I also directly infringed at least claim 7 of the '839 patent in violation of 35 U.S.C. § 271(a). Because Defendants' servers push out data ahead of playback, playback can begin before the initial buffer contents have been fully received at the user computer, providing a rapid streaming startup. Based on the same observations detailed above with respect to the '453 patent, this conduct likewise entails meeting similar limitations recited in the '839 patent claims, of preloading a server buffer ("**loading the server buffer with streaming media data elements**") and sending its contents at an initial sending rate more rapid than the playback rate sufficient for the user system to begin playing ("**sending an initial amount of streaming media data elements to the user system at an initial sending rate more rapid than the playback rate … wherein the initial amount of streaming media data elements, and the initial sending rate, are sufficient for the user system to begin**

**playing back the streaming media while the user buffer continues to fill**"), followed by transmission at about the playback rate ("**thereafter, sending further streaming media data elements to the user system at about the playback rate and filling the server buffer or moving a data window through the server buffer at about the playback rate … wherein the further streaming media data elements are received at about the playback rate by the user system if there are no interruptions in the transmission of streaming media data elements between the server and the user system**"). The transport mechanisms that Defendants used, as alleged in paragraph 28, detect ACKs and/or NACKs from downstream in the streaming distribution ("**detecting if any interruptions in the transmission of streaming media data elements between the server and the user system have occurred such that streaming media data elements that have been sent by the server to the user system have been delayed or not received by the user system**"), and, as alleged in paragraph 36, distribute a stream to a plurality of users using a record of the last streaming media data element sent to the user system to identify the next streaming media data element to send ("**maintaining a record of the last streaming media data element that had been sent to the user system, and using the record to identify the next streaming media data element to be sent to the user system**"), meeting those and all other limitations of claim 7 of the '839 patent, literally or under the doctrine of equivalents.

42. Pursuant to 35 U.S.C. § 284, WAG is entitled to not less than a reasonable royalty for Defendants' infringing use of the '839 patent, in an amount subject to proof at trial, together with interest and costs as fixed by the Court.

43. WAG is entitled to recover all past damages so sustained by WAG as a result of Defendants' infringement alleged herein.

## COUNT III: DIRECT INFRINGEMENT OF THE '611 PATENT

44. WAG repeats and realleges the allegations of paragraphs 1-433 above as if fully set forth at length herein.

45. Defendants' conduct as set forth in Count I also directly infringed at least claims 1, 2, and 6 of the '611 patent, in violation of 35 U.S.C. § 271(a). Said conduct, as reflected, *e.g.*, in paragraph 28, likewise entails, as recited in claim 1 of the '611 patent, "**sending initial streaming media elements to the user system at an initial sending rate more rapid than the playback rate, to fill the user buffer**." Due to the delivery of data in advance of what is needed for playback (as alleged, *e.g.*, in paragraph 29), "**the amount of [the] initial elements, and [the] initial sending rate, are sufficient for the user system to begin playback while the user buffer continues to fill**." The same allegations also reflect that "**[a]fter the user buffer has been filled**" (as alleged in Count I), Defendants' server, now viewing the steam in the aggregate, "**send[s] further streaming media data elements to the user system at about the playback rate**." As alleged in Count I (paragraph 25), the feeds from Defendants' performers' webcams fill server buffers on Defendants' servers at a constant fill rate. Because of the operation of the server's transport mechanism (*see, e.g.*, paragraph 28), after the server's buffer has been emptied as a result of sending the observed initial burst of data upon connection, data arrives at the server thereafter at about the same rate it is being consumed by the client, such that the data sent by the server from what it is receiving from the performers at the playback rate is received at the same rate by the user computer if there are no interruptions in the transmission of media data between the server and the user's computer ("**the media data elements is sent at a rate that matches the constant fill rate of a server buffer, and is received at the same rate by the user computer if there are no interruptions in the transmission of media data between the server**

**and the user's computer**"). Defendants' conduct thereby met those and all other limitations of claim 1 of the '611 patent, literally or under the doctrine of equivalents.

46. Defendants likewise directly infringed claim 6 of the '611 patent by using media encoded at a variable bitrate (such as MPEG-4).

47. Pursuant to 35 U.S.C. § 284, WAG is entitled to not less than a reasonable royalty for Defendants' infringing use of the '611 patent, in an amount subject to proof at trial, together with interest and costs as fixed by the Court.

48. WAG is entitled to recover all past damages so sustained by WAG as a result of Defendants' infringement alleged herein.

## DEMAND FOR JURY TRIAL

WAG demands trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff WAG ACQUISITION, L.L.C. requests an entry of judgment in its favor and against Defendants as follows:

a. Declaring that Defendants infringed United States Patent Nos. 10,567,453, 8,364,839, and 8,185,611;

b. Awarding to WAG damages arising out of Defendants' infringement of United States Patent Nos. 10,567,453, 8,364,839, and 8,185,611, against the Defendants, jointly and severally;

c. Awarding attorneys' fees, costs, or other damages pursuant to 35 U.S.C. §§ 284 or 285 or as otherwise permitted by law, against the Defendants, jointly and severally;

d. Awarding costs in this action to WAG, against the Defendants, jointly and severally; and

    e.  For such other and further relief as the Court may deem just and proper.

Date: February 10, 2025

Respectfully submitted,

By: */s/ Wasif H. Qureshi*
Wasif H. Qureshi
wqureshi@jw.com
**JACKSON WALKER LLP**
1401 McKinney, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4521

David G. Liston (*pro hac vice forthcoming*)
david.liston@listonabramson.com
Ronald Abramson (*pro hac vice forthcoming*)
ron.abramson@listonabramson.com
Liston Abramson LLP
The Chrysler Building
405 Lexington Avenue, 46th Floor
New York, NY 10174
212-257-1630

**COUNSEL FOR WAG ACQUISITION, L.L.C.**